## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 06 2020, 8:52 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT
Valerie K. Boots
Indianapolis, Indiana

Anna O. Holden
Zionsville, Indiana

ATTORNEYS FOR APPELLEE
Curtis T. Hill, Jr.
Attorney General of Indiana

Zachary R. Griffin
Robert J. Henke
Abigail Recker
Deputy Attorneys General
Indianapolis, Indiana

Dede K. Connor
Child Advocates, Inc.
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of J.E. (Minor Child) and B.E. (Mother)

B.E. (Mother),

*Appellant-Respondent,*

v.

February 6, 2020

Court of Appeals Case No. 19A-JT-1690

Appeal from the Marion Superior Court

The Honorable Mark A. Jones, Judge

The Honorable Peter Haughan, Magistrate

| Indiana Department of Child Services, | Trial Court Cause No. 49D15-1810-JT-1247 |
|---|---|
| *Appellee-Petitioner,* | |
| And | |
| Child Advocates, Inc., | |
| *Appellee-Guardian ad Litem.* | |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, B.E. (Mother), appeals the trial court's termination of her parental rights to her minor child, J.E. (Child).

We affirm.

# ISSUE

Mother raises one issue on appeal, which we restate as follows: Whether the Department of Child Services (DCS) presented clear and convincing evidence that the termination of the parent-child relationship is in the Child's best interests.

# FACTS AND PROCEDURAL HISTORY

[4] Mother and R.D. (Father)[1] are the biological parents to the Child, who was born on May 7, 2010, and who was nine years old at the time of the termination proceedings. Child was initially adjudicated a Child in Need of Services (CHINS) in 2012, but the case was eventually closed and Child was reunited with Mother. On October 4, 2017, the DCS filed a subsequent petition, alleging that the Child and his sister[2] witnessed domestic violence between Mother and her boyfriend, that the home was infested with bedbugs, and that Mother was abusing drugs. DCS removed Child from Mother's care and placed him with his Maternal Aunt. Upon DCS's removal of the Child, Mother made some improvements to her home, including purchasing a new bed for Child. After DCS assessed the home, Mother sent Facebook and text messages to DCS staff, claiming that they were harassing her and lying on the report. In these messages, Mother also included the name of the nephew of a DCS staff member. Mother tested positive for methamphetamines on October 31, November 1, and November 10, 2017.

[5] On February 27, 2018, the trial court adjudicated Child to be a CHINS and instituted a parental participation order, ordering Mother to: (1) engage in home-based therapy and follow that service provider's recommendations; (2)

---

[1] Father does not appeal the termination of his parental rights.

[2] Child's sister is not a subject of this termination of parental rights case. Her CHINS matter was resolved after the trial court granted custody to her biological father.

engage in home-based case management services and follow that provider's recommendations; (3) complete a substance abuse assessment and follow all treatment recommendations; (4) submit to random drug and alcohol screens; (5) complete a psychological evaluation and its treatment recommendations; and (6) complete a domestic violence assessment. In its October 16, 2018 order on the Child's permanency hearing, the trial court approved DCS's request to change the permanency plan from reunification to adoption.

[6] During the proceedings in this case, Mother failed to engage or successfully complete any services. Mother refused to participate in home-based therapy or substance abuse assessments. Mother participated in some home-based case management, but of the twenty reports DCS should have received, DCS only received between four and six reports. Mother refused to engage in court-ordered mental health treatment despite several DCS referrals. Although Mother claimed to have completed twelve psychological evaluations, Mother was unable to provide the paperwork related to these evaluations or indicate with specificity the date and locations of these assessments. Eventually, Mother completed an intake assessment related to substance abuse and mental health at Centerstone in March 2019. She informed the intake counselor that she needed treatment related to trauma, PTSD, and a traumatic brain injury; and she admitted to having a history of using cocaine and methamphetamines. After the initial intake, Mother did not return. Community Health Network, Adult and Child, and Children's Bureau, among others, received referrals to provide

Mother with services and each closed the referrals when Mother declined to participate.

[7] Instead of participating in services, Mother focused on using the services to physically retrieve the Child. During her meetings with Carol Colbert (Colbert), a home-based case manager with Family and Community Partners, Mother refused a mental health evaluation because "she was protected by the CIA, she was a protected person." (Transcript p. 92). Colbert had difficulties engaging Mother in services because Mother would request to "go with [her] to the police department" to "go and get [her] kids." (Tr. p. 92). When Colbert informed her that she was unable to do that, Mother would just shut down as "[s]he didn't want to do anything but for [Colbert] to get her children." (Tr. p. 92).

[8] Mother failed to maintain contact with DCS, and would go long periods of time without returning her service providers' communications. When she attended team meetings, the tenor of the meetings was usually set by Mother's threats to providers and accusations of DCS's conspiracy against her. Mother claimed to have recently been employed by Dollar Tree as a whistleblower reporting financial crimes and as an assistant manager for multiple stores. She reported having been laid off because of "racketeering." (Tr. p. 111).

[9] Mother received multiple visitation referrals for supervised visits with the Child. Initially, the two-hour visits would start off fine, with Mother arriving prepared with food and activities to engage the Child. However, during the second hour,

Mother's "behavior would become erratic." (Tr. p. 34). Mother would talk to herself, bang on the doors in the facility, talk to the cameras and say "so you guys see how good I'm doing with my children, why won't you let me have my children[.]" (Tr. p. 36). Mother made promises she could not keep and her mood would fluctuate. Mother also discussed the current case with the Child, letting him believe that DCS was preventing him from returning home even as she had completed everything DCS had asked. She would attempt to engage the Child in conversations about finances, deaths in the family, and conspiracy theories about the case. When Mother displayed this behavior, Child would "just kind of go quiet, and kind of ignore [.]" (Tr. p. 37). "He would put his head down and just remain quiet." (Tr. p. 38). Mother frequently cancelled visits at the last minute or cut the visitation short. When the visits did not occur, the Child was visibly upset and when the visits were cut short, the Child would cry and appear angry. Eventually, visitation was suspended due to safety concerns for the visitation facilitator and the Child.

[10]   Throughout the proceedings in this case, the Child was placed in relative care with his Maternal Aunt. When the Child was first placed with Maternal Aunt, "he was really withdrawn, he wouldn't have a conversation with anyone, [he] was real quiet, he wouldn't even make eye contact, [was] very angry, [] [and] just kind of sat by himself." (Tr. p. 98). After a year and a half in Maternal Aunt's care, "he's happy, he's healthy, he made honor roll last month, he got student of the month, he engages in conversations, he participates" in family activities. (Tr. p. 99). Since Mother's visits have been suspended, she has

engaged in a pattern of harassment of Maternal Aunt, including calling the police to the Maternal Aunt's home forty-seven times, showing up at Maternal Aunt's place of employment and alleging that Maternal Aunt is defrauding Medicaid. Maternal Aunt obtained both a protective order and a no-contact order against Mother; yet, Mother continues to show up at the residence and place of employment. Each time the police were called to Maternal Aunt's home, the Child hid, cried, and became scared and upset.

[11] Clare Deitchman (Deitchman) was appointed as the Child's CASA in October 2017. While the case was pending, Deitchman met with the Child every other month. She observed that the Child

> has done really well in his current placement. He is a different young man than he was when he was first placed there. He has really grown and blossomed[.] [W]hen I first started meeting with him, he was very engrossed in trying to close out the world by doing a lot of computer games, he would not engage, he wouldn't look at you in the eye, he wouldn't have a conversation with me. When I go and see him now, we sit down at the kitchen table, there's no electronics, we have a conversation, we read books together, we color together, he tells me about his school, some of his activities, his playmates. He is so much more grounded and has structure and stability, he knows that he's going to be safe.

(Tr. pp. 64-65).

[12] On October 16, 2018, DCS filed a Verified Petition for Involuntary Termination of Parent-Child relationship. On March 11, April 15, and April 26, 2019, the trial court conducted an evidentiary hearing on DCS's petition.

Mother failed to appear for the first and the final day of hearings. Her testimony at trial was unclear, inconsistent, and riddled with conspiratorial stories of her life, her employment, her time with DCS, and her family. On June 21, 2019, the trial court entered its findings of fact and conclusions thereon, terminating Mother's parental relationship with her Child.

[13] Mother now appeals. Additional facts will be provided if necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

[14] Mother challenges the termination of her parental rights to her Child. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). However, parental rights "are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Id.* If "parents are unable or unwilling to meet their parental responsibilities," termination of parental rights is appropriate. *Id.* We recognize that the termination of a parent-child relationship is "an 'extreme measure' and should only be utilized as a 'last resort when all other reasonable efforts to protect the integrity of the natural

relationship between parent and child have failed.'" *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015).

[15] Indiana courts rely on a "deferential standard of review in cases concerning the termination of parental rights" due to the trial court's "unique position to assess the evidence." *In re A.K.*, 924 N.E.2d 212, 219 (Ind. Ct. App. 2010), *trans. dismissed*. Our court neither reweighs evidence nor assesses the credibility of witnesses. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013). We consider only the evidence and any reasonable inferences that support the trial court's judgment, and we accord deference to the trial court's "opportunity to judge the credibility of the witnesses firsthand." *Id.*

## II. *Termination of Parental Rights Statute*

[16] In order to terminate a parent's rights to her child, DCS must prove:

> (A) that one (1) of the following is true:
>
> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
> * * * *
> (iii) The child has been removed from the parent and has been under the supervision of a local office . . . for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a [CHINS] . . . ;
>
> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a [CHINS];
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove each of the foregoing elements by clear and convincing evidence. *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014). "[C]lear and convincing evidence requires the existence of a fact to 'be highly probable.'" *Id.*

[17] Mother's only challenge to the trial court's decision to terminate her parental rights centers on the best interests prong of the statute. *See* I.C. § 31-35-2-4(b)(2)(C). The premise of her argument focuses on the trial court's "litany of Mother's failings, many of which are not related to domestic violence—the reason DCS filed the CHINS action that preceded this termination matter. Absent some evidence that [Child] was actually and specifically affected, evidence that he is 'better' outside of Mother's care is no more than an assertion that a 'better' home exists." (Appellant's Br. p. 21). Essentially, Mother maintains that parental rights may not be terminated simply because another home is preferable to that of a child's biological parent.

[18] Perhaps the most difficult determination in a termination of parental rights proceeding is whether terminating parental rights is in the child's best interests—a question that necessarily places the child's interest in preserving the family into conflict with their need for permanency. *In Re E.M.*, 4 N.E.3d 639, 647 (Ind. 2014). To determine whether termination is in a child's best interests, the trial court must look to the totality of the evidence. *In re A.D.S.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. The court must subordinate the interests of the parents to those of the child and need not wait until a child is irreversibly harmed such that a child's physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *See Id.*; *In re E.M.*, 4 N.E.3d at 648. We agree with Mother that "the right of parents to raise their children should not be terminated solely because there is a better home available for the children." *In re K.S.*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). And while the need for permanency is certainly *a* factor in determining whether termination is in the child's best interest, a child's need for immediate permanency is not reason enough to terminate parental rights where the parent has an established relationship with his/her child and has taken positive steps in accordance with a parent participation plan towards reunification. *In re V.A.*, 51 N.E.3d 1140, 1152 (Ind. 2016).

[19] In the current case, DCS initially became involved due the domestic violence inside the home. Upon investigating the residence, DCS discovered that Mother was abusing drugs, the home was cluttered, there was no bedding for the Child, the home was infested with bedbugs, and there was standing water in

buckets on the floor. To remedy this situation and to work towards reunification with the Child, the court mandated services through multiple service providers and imposed a supervised visitation schedule.

[20] The evidence in this case overwhelmingly establishes that Mother did not comply with services. Rather, even though Mother, at times, appeared to commence a particular court-mandated service, she viewed the service not as an avenue to help her to become a better parent but as a way to forcefully get her Child back. Inevitably, the service ended as Mother "didn't want to do anything" but to go get her Child. (Tr. p. 92). Team meetings, even when commenced with the best intentions, would devolve into Mother making threats to providers and hurling accusations of perceived DCS conspiracies against her. A similar pattern continued during Mother's supervised visits with the Child. Instead of focusing on the Child, Mother attempted to engage the Child in conversations about finances and conspiracy theories about the case. She discussed the proceedings with the Child, encouraging him to believe that DCS was preventing him from returning to her care. When Mother displayed this behavior, the Child would put his head down and just remain quiet.

[21] The evidence reflects that Child has been in relative care since October 2017. When he first arrived at his Maternal Aunt's residence, he was withdrawn and would not engage in communications. At the time of the termination proceedings, Maternal Aunt testified that the Child was happy and healthy in her care. He engaged in conversations, participated in family activities, and was doing well in school. Nevertheless, when Mother started calling the police

and claiming that Maternal Aunt had kidnapped her Child, the Child's behavior regressed and he became upset and cried. Deitchman, Child's CASA, confirmed Maternal Aunt's testimony. Deitchman, who met with the Child every other month, informed the trial court that the Child has "really grown and blossomed" in his relative care placement. (Tr. p. 64). The Child "is so much more grounded and has structure and stability, he knows that he's going to be safe." (Tr. p. 65). Likewise, Child's case manager, Sharmaine Branch, observed that the Child is "just happier" and opined that Mother "hasn't done anything to remedy the reasons we are involved, she hasn't engaged in services and she hasn't addressed her mental health and substance abuse, and I don't believe placing [the Child] back in the home with her would be in his best interest." (Tr. p. 190).

[22] Mother's persistent hostility toward services and service providers, combined with her inability to maintain employment or housing, negatively impacted any preservation of the parent-child relationship and resulted in the trial court's conclusion that conditions resulting in removal or reasons for placement outside the home had not been remedied. *See* I.C. § 31-35-2-4(b)(2)(B)(i). While we agree with Mother that the Child is not yet "irreversibly influenced by a deficient lifestyle," Child's social growth showed signs of impairment by being withdrawn, becoming reclusive, and avoiding eye contact when DCS became first involved. (Appellant's Br. p. 24). Mother's complete refusal to take positive steps towards reunification, combined with the Child's need for permanency after being placed with his Maternal Aunt for more than two years,

is sufficient to conclude that termination of the parental relationship will be in the Child's best interests. *See In re V.A.*, 51 N.E.3d at 1152.

# CONCLUSION

[23] Based on the foregoing, we conclude that DCS presented clear and convincing evidence to support the trial court's conclusion that terminating Mother's parental rights to the Child is in the Child's best interests.

[24] Affirmed.

[25] Baker, J. and Brown, J. concur